2003-NMSC-024

76 P.3d 1098

Nicholas J. **BERLANGIERI** and Carol Berlangieri, Plaintiffs–Respondents,

v.

**RUNNING ELK CORPORATION** and Second Running Elk Corporation, d/b/a The Lodge at Chama, Defendants–Petitioners.

No. 27,492.

Supreme Court of New Mexico.

Aug. 28, 2003.

343

Bingham, Hurst, Apodaca, Wile & Schoen, Wayne E. Bingham, Albuquerque, NM, Butt, Thornton & Baehr, P.C., Emily A. Franke, Michael P. Clemens, Albuquerque, NM, for Petitioners.

John R. Tiwald, Clara Ann Bowler, Albuquerque, NM, for Respondents.

Michael B. Browde, Carpenter & Chavez, William H. Carpenter, Albuquerque, NM, for Amicus Curiae New Mexico Trial Lawyers Association.

McClaugherty & Silver, P.C., Joe L. McClaugherty, Kate LaMothe, Albuquerque, NM, for Amici Curiae New Mexico Ski Area Operators Association, Albuquerque International Balloon Fiesta, Inc., Alpine Sports, Inc., High Desert Anglers, Triclub New Mexico, Sportz Outdoor, Inc., New Mexico Winter Sports Alliance, Sports Systems, New Mexico Activities Association, New Mexico River Outfitters Association, Albuquerque Bicycle Center, Tourism Association of New Mexico, Albuquerque Convention and Visitors Bureau, and Ski New Mexico.

## OPINION

MINZNER, Justice.

{1} Petitioners Running Elk Corp. and Second Running Elk Corp. (Running Elk) petitioned this Court to review an opinion of the Court of Appeals, which held that a liability release signed by Respondent Nicholas Berlangieri was unenforceable. *See Berlangieri v. Running Elk Corp.*, 2002–NMCA–060, ¶ 22, 132 N.M. 332, 48 P.3d 70, *cert. granted*, 132 N.M. 288, 47 P.3d 447 (2002). The Court of Appeals reversed an order of the district court that granted Running Elk summary judgment on the basis that the release was enforceable. The Court of Appeals held that liability releases such as the one signed by Berlangieri are invalid as a matter of law "because commercial operators of recreational premises are subject to a nondisclaimable duty to exercise ordinary care to protect patrons from foreseeable risks of physical injury or death." *Id.* ¶ 1. We agree with the Court of Appeals that the liability release at issue in this case is unenforceable. We do not believe, however, that a broad rule invalidating all liability releases in the recreational context is warranted. Rather, based on a review of the relevant limiting factors, we conclude this release is contrary to public policy. Accordingly, we affirm the result reached by the Court of Appeals, on different grounds, and we remand to the district court for further proceedings consistent with this opinion.

**I**

{2} Running Elk operates a recreational resort facility in northern New Mexico, named "The Lodge at Chama" (the Lodge).

The Lodge offers recreational activities, such as fishing, horseback riding, hiking, and sport shooting, to its guests. On May 29, 1996, Berlangieri, a Honeywell Corp. employee, stayed as a guest at the Lodge with a group of colleagues. Berlangieri arranged to take part in a guided horseback trail ride on that day.

{3} In preparation for the trail ride, the Lodge manager spoke with each of the group participants, including Berlangieri, to determine the participants' levels of skill and experience with horses. She determined that Berlangieri and his group were novice riders. As a result, gentle, easygoing horses were selected for his group to ride. She also informed Berlangieri and the other guests that horseback riding entailed certain unavoidable risks of injury due to the unpredictable nature of horses.

{4} The Lodge manager also gave the guests, including Berlangieri, a copy of the Lodge's "Agreement for Release and Assumption of Risk" and asked them to read and sign it. The release contained the following language:

> The undersigned, being over the age of 18, (or if under the age of 18, through my natural parent or legal guardian) hereby agree with THE LODGE AT CHAMA.
>
> I acknowledge that I have been informed of, and that I am otherwise aware of, the risks involved in fishing, horseback riding, hiking and shooting the sporting clays on the lands of THE LODGE AT CHAMA. I hereby declare that I possess sufficient skills and experience in the above mentioned activities without causing injury to myself or other guests of THE LODGE AT CHAMA.
>
> In consideration of being permitted to participate in the above mentioned activities and otherwise use the lands of THE LODGE AT CHAMA, I agree:
>
> To use due care while engaging in the above mentioned activities on the lands of THE LODGE AT CHAMA, including, but not limited to, each and every risk resulting from negligent acts or omissions of any other person or persons, including employ-

ees and agents of THE LODGE AT CHAMA. I further agree to exculpate and relieve THE LODGE AT CHAMA and its employees, representatives and agents, from all liability for any loss, damage, or injury, whether to person or property which I may suffer while engaging in activities and/or using the lands of THE LODGE AT CHAMA all whether or not resulting from the negligent act or omission of another person or persons.

The Lodge manager asked the guests whether they understood the terms of the agreement as they signed it. The guests, including Berlangieri, apparently stated that they did. Berlangieri has no memory of this discussion with the Lodge manager, or signing the release, but he does not dispute that his signature appears on an executed release. He alleges that this loss of memory is a result of the injuries he sustained while a guest at the Lodge.

{5} An employee of the Lodge with twenty years of experience working with horses saddled Berlangieri's horse for the trail ride. This employee attested that the saddle, equipment, and tack [1] he put on Berlangieri's horse were all in good, serviceable condition and properly positioned on the horse. This employee also told all of the guests that they would be traveling at a walk during the trail ride and that the horses would not be allowed to run in order to reduce the risk of an accident. He also told the guests that he would lead the group and that they should stay behind him.

{6} During the trail ride, another guest noticed that the behavior of Berlangieri's horse "stood out" because it constantly tried to move to the head of the group and move faster than the other horses. At the end of the ride, the trail guide dismounted and held the gate to the horse pen open for the guests to enter. As the last of the group passed through the gate, he was informed that one of the guests had fallen. He rushed to the rider's side and saw that it was Berlangieri. He attested that Berlangieri's horse was

---

**1.** We recognize that "tack" is defined as "[t]he harness for a horse, including the bridle and saddle." *American Heritage Dictionary of the English Language* 1760 (4th ed.2000). Hereinaf-

ter, this opinion will use the term "tack" as inclusive of all of the equipment mounted on the horse for riding.

nearby, and the saddle was still in the proper position. He further attested that he removed the tack from the horse after attending to Berlangieri.

{7} Two other members of the group witnessed the fall. They attested that as the group neared the barn, Berlangieri's horse began to gallop. As the horse was running, Berlangieri fell off to the right side. One group member testified that Berlangieri "came off the horse as if he was the hand of a clock moving around the center point." Another group member stated that "[i]t appeared to be a slow fall to the right, with Nick [Berlangieri]'s body continually facing forward. He remained upright in the sense that his back remained approximately straight." It appeared that Berlangieri's head and shoulder struck the ground first. Each of these individuals stated that in his opinion the manner of Berlangieri's fall was consistent with the saddle sliding to the side, but neither actually saw the saddle slide or move. One of them did state that he noticed that Berlangieri's horse no longer had a saddle approximately two minutes after the fall. Plaintiff produced an affidavit of an expert who also gave an opinion that the saddle slid to the side during the fall, either because it was not properly positioned or the equipment failed, based on the testimony of the other group members. Berlangieri could not testify to the circumstances of the fall because he has no memory of it.

{8} Berlangieri sued Running Elk in the district court in Santa Fe County, alleging that Running Elk's employees failed to properly install the tack on the horse and Running Elk either knew or should have known that the tack was faulty or improperly installed. Berlangieri alleged that these acts constituted "negligence, carelessness, and recklessness." He alleged damages for physical injury, pain and suffering, loss of enjoyment of life, as well as medical bills "of several hundred thousand dollars" and lost income "in excess of $450,000." Berlangieri's wife also brought a loss of consortium claim.

{9} Running Elk filed a motion for summary judgment, arguing that the case should be dismissed on two grounds. First, it claimed that the Equine Liability Act, NMSA 1978, §§ 42–13–1 to –5 (1993, as amended through 1995), insulated it from liability because the accident was the result of "equine behavior." Second, Running Elk claimed the release signed by Berlangieri exculpated it from all liability for negligence. The district court denied summary judgment on the first ground, finding that there was no showing that the fall occurred as a result of equine behavior. The court granted the motion on the basis of the release signed by Berlangieri. The court held that the release was enforceable, because there was no relevant exception to the general rule that releases of liability for negligence are enforceable.

{10} Berlangieri appealed to the Court of Appeals, claiming that the liability release should not be enforced on public policy grounds. While disagreeing with Berlangieri that the Equine Liability Act expresses a public policy sufficient to invoke the exception to the rule that releases such as this one are generally enforceable, *see Berlangieri,* 2002–NMCA–060, ¶ 12, 132 N.M. 332, 48 P.3d 70, a majority of the panel held that "the societal interests furthered by the law of negligence" dictate that releases of liability for negligence should never be enforceable when a risk of "serious physical injury or death to the releasor" is at stake, *id.* ¶ 15. The Court believed that the question presented to it was one of first impression, because Berlangieri brought a claim for personal injury, and all of the prior cases in this state regarding releases of liability for negligence only addressed a risk of economic loss. *Id.* ¶ 14. The Court expressly stated that its holding was not limited to equine activities, *id.* ¶ 18, but that all "commercial operators of recreational or sports facilities" would no longer be able to disclaim their "duty to exercise due care to avoid risks of physical injury to consumers," *id.* ¶ 22. The Court of Appeals reversed the district court's order granting summary judgment in favor of Running Elk and remanded the case for a trial on the merits. *Id.* ¶ 31.

{11} Judge Sutin dissented. Although he agreed with the majority that the Equine Liability Act does not express a public policy sufficient to declare the release in the present case unenforceable, *id.* ¶ 70 (Sutin, J., dissenting), he disagreed with "the absolute, end of the spectrum view taken by the ma-

jority as a solution to the concerns about releases," *id.* ¶ 41. He argued that it would be wiser to continue to consider releases on a case by case basis, as has been done by this Court in other contexts. *Id.* ¶¶ 42, 61. Finding no public policy independent of the Equine Liability Act to support invalidation, he believed that the release in this case should be enforced and would have affirmed the district court's order granting summary judgment in favor of Running Elk. *Id.* ¶¶ 51–60.

{12} We agree with the dissent's assessment that releases should be considered on a case by case basis, but we disagree with both the majority and dissenting views of the Court of Appeals that we cannot rely on the Equine Liability Act in analyzing public policy relevant to this case. We therefore reverse the district court's order granting summary judgment in favor of Running Elk, and we affirm the disposition of the Court of Appeals, on different grounds. Our reasons are as follows.

## II

{13} The distinction between types of damages the Court of Appeals makes and the broad rule adopted by the Court of Appeals have more legislative support than judicial. Jurisdictions that disallow the use of liability releases for personal injury usually do so as a matter of statutory enactment, rather than common law. The statutes vary in scope. For example, Great Britain and the State of Louisiana have code provisions that forbid contracts exculpating one party from liability for negligence that results in personal injury. *See* Unfair Contract Terms Act, 1977, c. 50, § 2(1) (Eng.) ("A person cannot by reference to any contract term or to a notice given to persons generally or to particular persons exclude or restrict his liability for death or personal injury resulting from negligence."); La. Civ.Code Ann. art. 2004 (West 1987) ("Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party."). The State of Hawai'i has a similar statute, although it only applies to businesses providing recreational activities, and permits a waiver of inherent risks. Haw.Rev.Stat. § 663–1.54(a), (b) (Supp.2002) ("Any person who owns or operates a business providing recre-

ational activities to the public ... shall be liable for damages resulting from negligent acts or omissions of the person which cause injury."). In another variation, the State of New York has a similar but more general statute, which disallows any release of liability for negligence executed by a recreational enterprise, but does not distinguish between types of risks or types of damages that may not be disclaimed. *See* N.Y. Gen. Oblig. Law § 5–326 (Consol.1977).

{14} In contrast, the overwhelming majority of states that do not have similar statutes hold that waivers of liability for the negligence of recreational businesses will be enforced, within strict limits. *See, e.g., Jones v. Dressel,* 623 P.2d 370, 376–78 (Colo.1981) (upholding an exculpatory agreement entered into between a skydiving operation and a patron). There are a few notable exceptions to this rule. Berlangieri asks that we adopt the approach taken by the courts in Vermont, which have recognized a broad public policy exception for recreational facilities such as ski areas that hold their premises open to the public. *See Dalury v. S–K–I, Ltd.,* 164 Vt. 329, 670 A.2d 795, 798–99 (1995); *Umali v. Mount Snow, Ltd.,* 247 F.Supp.2d 567, 572–75 (D.Vt.2003) (applying the rule of *Dalury* to a mountain bike race). *See also Hiett v. Lake Barcroft Cmty. Ass'n,* 244 Va. 191, 418 S.E.2d 894, 896–97 (1992). We agree that these opinions articulate thoughtful arguments for a broad rule that releases for recreational activities should not be enforced. For example, we cannot deny the truth of the statement that recreational business operators, not their patrons, "have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees." *Dalury,* 670 A.2d at 799.

{15} Ultimately, we cannot accept the broad rule promoted by these other jurisdictions or the Court of Appeals in this case. The fundamental reason is that such a sweeping approach fails to take into account all of the countervailing policy interests that weigh in favor of allowing some releases to be enforced. The statutes that have been adopted in other jurisdictions illustrate the range of options available in addressing the

policy issues that arise from the importance of recreational facilities economically and the risk of personal injury many popular activities present. Courts are generally less well-equipped to address complex policy issues than legislatures. *See generally* Ammie I. Roseman–Orr, Comment, *Recreational Activity Liability in Hawai'i: Are Waivers Worth the Paper on Which They are Written?*, 21 U. Haw. L.Rev. 715, 730–31 (1999) ("More than half of all states have legislation in place to allocate the responsibilities between recreational providers and participants. Most statutes addressing the allocation of recreational activity liability deal with a specific activity, such as skiing."). The Legislature in this state has addressed two recreational activities, skiing and horseback riding. *See* NMSA 1978, §§ 24–15–1 to 14 (1969, as amended through 1997); §§ 42–13–1 to –5. We believe a broader rule must come from the Legislature as well.

{16} We believe the approach taken by the Court of Appeals is unpersuasive for another reason. The approach does not explain why we should not permit any releases for liability from negligence. Our prior case law is not easily distinguished.

{17} The appellate courts of this state have generally held that agreements that exculpate one party from liability for negligence will be enforced, unless they are "violative of law or contrary to some rule of public policy." *Sw. Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n*, 67 N.M. 108, 118, 353 P.2d 62, 69 (1960); *accord Lynch v. Santa Fe Nat'l Bank*, 97 N.M. 554, 558, 627 P.2d 1247, 1251 (Ct.App.1981). The Court of Appeals majority is correct to point out, however, that each time this Court has applied the rule, it has been in the context of purely economic damages, rather than personal injury. *Berlangieri*, 2002–NMCA–060, ¶ 14, 132 N.M. 332, 48 P.3d 70. The Court of Appeals also draws a distinction between releases executed for recreational activities, and releases executed in other contexts. *See id.* ¶ 1. Nevertheless, we do not think this is an issue of first impression. Although previous cases such as *Lynch* and *Southwest Public Service Co.* involved releases for damages due to economic injuries arising out of different contexts than the recreational industry, the cases never perceived such a distinction as

relevant. In fact, in *Lynch*, the Court of Appeals relied extensively on the widely followed opinion of the California Supreme Court, *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963), which involved a claim for personal injury as a result of negligent medical care. *See Lynch*, 97 N.M. at 558–59, 627 P.2d at 1251–52. Similarly, in *Southwestern Public Service Co.*, this Court relied on a wrongful death case, *Mares v. N.M. Pub. Serv. Co.*, 42 N.M. 473, 82 P.2d 257 (1938), to determine the duty that could not be disclaimed by an electric utility. *See Sw. Pub. Serv. Co.*, 67 N.M. at 120, 353 P.2d at 70. Accordingly, we think the framework of analysis taken by our prior cases is appropriate.

{18} Our Legislature has not made any general pronouncements on the subject. The rule followed by the courts of this state thus far tracks the rule followed in a majority of other courts, as well as the Restatement (Second) of Torts § 496B (1965), which states that "[a] plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy," except that we will not enforce a release from liability for reckless conduct in some contexts. *See Baker v. Bhajan*, 117 N.M. 278, 281 n. 1, 871 P.2d 374, 377 n. 1 (1994). The Restatement (Second) of Contracts § 195(2) (1981) further articulates specific ways in which public policy will render a liability release unenforceable. *See id.* (providing that a public policy exception applies to employer-employee contracts, public service contracts, and other contracts involving a "protected class"). The recently promulgated Restatement (Third) of Torts: Apportionment of Liability § 2 (2000), does not alter this rule, and could be construed to expressly allow for waivers of liability for personal injury. *See id.* cmt. b. ("In appropriate situations, the parties to a transaction should be able to agree which of them should bear the risk of injury, even when the injury is caused by a party's legally culpable conduct.").

{19} The problem that courts face when deciding whether to uphold an exculpatory

agreement is determining what would be a sufficient "public policy" to invoke the exception to the rule. This problem becomes exacerbated when one realizes that such public policies often "hunt in pairs." *See* Thomas A. Reed, *Holmes and the Paths of the Law,* 37 Am. J. Legal Hist. 273, 299 (1993). The Court of Appeals majority concluded that "the policies furthered by the law of negligence" are sufficient to support a conclusion that the exculpatory agreement in this case is void. *Berlangieri,* 2002–NMCA–060, ¶ 16, 132 N.M. 332, 48 P.3d 70. In contrast, the dissent would have concluded that individual autonomy and the right to enter into a contract that expressly assumes the risk of injury should not be infringed, at least not as a matter of course. *Id.* ¶ 57 (Sutin, J., dissenting).

{20} The Court of Appeals characterized the policies underpinning tort law as public concerns, while characterizing the policies underlying our notions of freedom of contract as private; on this basis, the Court of Appeals majority concluded the scales balanced in favor of tort policies. We disagree. We do not think the underlying policies can be so easily separated into neat categories. Freedom of contract serves public policies that are no less important to society as a whole and the common good than those policies that undergird the law of tort.

> New Mexico ... has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals. "Great damage is done where businesses cannot count on certainty in their legal relationships and strong reasons must support a court when it interferes in a legal relationship voluntarily assumed by the parties."

*United Wholesale Liquor Co. v. Brown–Forman Distillers Corp.,* 108 N.M. 467, 471, 775 P.2d 233, 237 (1989) (quoting *City of Artesia v. Carter,* 94 N.M. 311, 314, 610 P.2d 198, 201 (Ct.App.1980)).

{21} The Court of Appeals also identified four policies furthered by the law of negligence, enunciated by this Court in *Trujillo v. City of Albuquerque,* 110 N.M. 621, 798 P.2d 571 (1990), *rev'd on other grounds,* 1998–NMSC–031, ¶ 2, 125 N.M. 721, 965 P.2d 305,

as sufficient to apply the exception to the rule in this case. In *Trujillo,* we said,

> Our fault system of recovery ... serves the important social functions of redistributing the economic burden of loss from the injured individuals on whom it originally fell, deterring conduct that society regards as unreasonable or immoral, and providing a vehicle by which injured victims may obtain some degree of compensation and satisfaction for wrongs committed against them and by which society may give voice and form to its condemnation of the wrongdoer.

*Id.* at 624, 798 P.2d at 574. The majority concluded that these interests belong to society, not individual parties, and societal interests should outweigh private interests in freedom of contract. *Berlangieri,* 2002–NMCA–060, ¶¶ 15–16, 132 N.M. 332, 48 P.3d 70.

{22} The Court of Appeals' analysis proves too much. "Many people think of personal injury cases when they think of tort law. But tort law is more than injury law because it includes rules for wrongs that cause economic and emotional injury even when no physical harm of any kind has been done." Dan B. Dobbs, *The Law of Torts* § 6, at 9–10 (2000). All of the underpinnings of tort law listed in *Trujillo* are applicable regardless of whether the victim suffers economic or physical injury. For example, in *Hagebak v. Stone,* 2003–NMCA–007, 133 N.M. 75, 61 P.3d 201, the Court of Appeals quoted the policy rationales listed in *Trujillo* as supporting a cause of action in defamation, *id.* ¶ 20, where the injuries alleged were purely economic, *see id.* ¶ 3 (stating that the defendant's allegedly defamatory statements "adversely affect[ed] his chances for reinstatement and damag[ed] his professional reputation"). We recognize that in other contexts, such as cases of indirect economic harm, a distinction can be drawn between these types of injury. *See, e.g., Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (holding that a plaintiff could not claim damages for economic injury unless it also suffered physical injury). *See generally* 4 Fowler V. Harper et al., *The Law of Torts* § 25.18A (2d ed.

1986) ("Under the prevailing rule in America a plaintiff may not recover in negligence for economic loss resulting from bodily harm to another . . . ). In this context, however, we think society's interests in deterring tortious conduct are not diminished or enhanced because of the type of harm.

{23} Amicus New Mexico Trial Lawyers Association argues that the effect of the Court of Appeals opinion would be to abolish the doctrine of express assumption of the risk in New Mexico. Amicus further argues that this is an appropriate result, because the abolition of contributory negligence in *Scott v. Rizzo*, 96 N.M. 682, 683, 634 P.2d 1234, 1235 (1981), obviated the need for judicially imposed all or nothing doctrines of recovery. For example, the doctrine of implied assumption of the risk was discarded as being subsumed in the doctrine of comparative negligence. *Id.* at 687, 634 P.2d at 1239. Other doctrines that limited the effects of the old contributory negligence rule, such as last clear chance and the distinction between gross and ordinary negligence (in some contexts), were also no longer needed with the adoption of comparative negligence. *Id.* These doctrines existed as judicial escape mechanisms to avoid the sometimes harsh results of contributory negligence, which operated to deny plaintiffs any recovery even if they were only minimally at fault for their injuries. *Id.* ("Under comparative negligence, rules designed to ameliorate the harshness of the contributory negligence rule are no longer needed.").

{24} We appreciate the thoughtfulness of this approach, in which the abolition of express assumption of the risk is the next step in the natural progression of the common law, as opposed to a greater departure from precedent. We believe, however, that the doctrine is significantly different from the others necessarily abolished after the imposition of a comparative negligence system. Express assumption of the risk is a doctrine that operates to bar all recovery, but it is not judicially imposed. Rather, it is a means of effectuating an agreement between the parties. *See Thompson v. Ruidoso-Sunland, Inc.*, 105 N.M. 487, 492, 734 P.2d 267, 272 (Ct.App.1987) ("Express assumption of the risk relates to that circumstance in which a landowner obtains a release

from another as a condition to allowing that person to engage in activities or use facilities on the owner's land."). Abolition of contributory negligence does not counsel in favor of abolishing the right of private parties to enter into agreements allocating the risks of injury. *See* Dobbs, *supra,* § 212 ("The plaintiff's consent to the defendant's conduct and the risk it entails is not about contributory negligence or the plaintiff's culpable conduct at all, but about consent, agreement, important information, or relationships that shift responsibility."); *cf. Torres v. El Paso Elec. Co.*, 1999–NMSC–029, ¶ 14, 127 N.M. 729, 987 P.2d 386 (limiting but declining to abolish the doctrine of independent intervening cause, despite its effect of denying all recovery against the defendant, because the doctrine was based on other policies than a response to contributory negligence), *overruled on other grounds by Herrera v. Quality Pontiac*, 2003–NMSC–018, 134 N.M. 43, 73 P.3d 181.

{25} We decline the invitation to abolish this doctrine now. Instead, we think that strict limits on the use of exculpatory agreements would better serve the important interests at stake. *See* 4 Harper et al., *supra,* § 21.6, at 247–52 (explaining that although in the nineteenth century liability releases were upheld with very little scrutiny when "unbridled freedom of contract was considered a paramount social good," in modern times, courts continue to uphold such agreements within strict limits).

{26} Many of the policies on which courts have relied in denying enforcement of agreements "are now firmly rooted in precedents accumulated over centuries." 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 5.2, at 9 (2d ed.1998). "One policy that has endured is that against the commission or inducement of torts and similar wrongs." *Id.* at 12.

Courts have had difficulty in applying the policy against the inducement of wrongs to agreements by which one party is exempted from tort liability to the other. A party clearly cannot exempt itself from liability in tort for harm that it causes intentionally or recklessly. However, a party generally can exempt itself from lia-

bility or limit its liability in tort for harm caused by negligence, as long as the provision is not unconscionable.

In exceptional cases, however, courts have held such an agreement unenforceable because the agreement affects the public interest and the other party is a member of the protected class.

*Id.* at 13–14 (footnotes omitted). The Restatement (Second) of Contracts § 195 reflects existing case law recognizing exceptional cases. We doubt the list is closed. The Supreme Court of Washington has analyzed a preinjury agreement releasing a defendant from liability for negligent conduct that occurred in the course of medical research as against public policy. *See Vodopest v. MacGregor,* 128 Wash.2d 840, 913 P.2d 779 (1996) (rejecting contention that injury should be viewed as occurring within a high-risk activity for which the release would have been valid). "A number of courts have now added [another] category by refusing to enforce exculpatory clauses in residential leases." 2 Farnsworth, *supra,* § 5.2, at 14.

▪ {27} We conclude the general rule that liability releases for personal injury may be enforced in limited circumstances should be retained. For the reasons that follow, however, the facts of this case fall within the exception to the general rule arising from public policy. Liability releases for equine recreational activities represent another exceptional case where public policy dictates that they not be enforced. Several considerations are relevant to this determination.

## III

▪ {28} In *Lynch,* the Court of Appeals identified several limiting factors that could operate to void an exculpatory agreement. The first relevant consideration from *Lynch* is that exculpatory clauses are construed strictly against the drafter. *Lynch,* 97 N.M. at 556, 627 P.2d at 1249. Before examining the release, it is necessary to understand the implications of a strict construction analysis.

## A

▪ {29} In strictly construing the release against Running Elk, we must look to the specific language of the release to determine whether it is sufficiently clear and unambiguous that it would inform the person signing it

of its meaning. *See Metro. Paving Co. v. Gordon Herkenhoff & Assocs.,* 66 N.M. 41, 45, 341 P.2d 460, 463 (1959) ("[I]n order to indemnify against the indemnitee's negligence the language must be clear and unequivocal . . . .") (quoted authority and quotation marks omitted); Restatement (Third) of Torts: Apportionment of Liability § 2 reporter's note cmt. d ("Courts normally construe exculpatory contracts strictly, finding that the plaintiff has assumed a risk only if the terms of the agreement are clear and unequivocal."). Drafting a release such as this can be a difficult balancing act because these releases must be written to be understood by those without legal training, but they also must contain sufficient legal terminology to survive a legal challenge. *See Nat'l & Int'l Bhd. of St. Racers, Inc. v. Superior Court,* 215 Cal.App.3d 934, 264 Cal. Rptr. 44, 46 (1989) (discussing the many methods of attacking such a release, as either not specific enough, or too comprehensive to be understood); *see also Metro. Paving Co.,* 66 N.M. at 44–45, 341 P.2d at 462 ("We do not feel that an express reference to indemnitee's negligence is necessary as a condition precedent to his being held harmless for his own negligence."); 4 Harper et al., *supra,* § 21.6, at 251 (discussing whether the term "negligence" must be explicitly used in a liability release to be enforceable).

▪ {30} In *Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781 (Colo.1989), the Supreme Court of Colorado considered the validity of a release that was executed in the context of a horseback injury very similar to the present case. The plaintiff was severely injured after the horse she was riding, which belonged to the defendant, reared up and fell backwards onto her. The defendant claimed that the liability release, which stated "THE UNDERSIGNED . . . WAIVES ANY CLAIM HE/SHE MIGHT STATE AGAINST THE STABLES AS A RESULT OF PHYSICAL INJURY INCURRED IN [horseback riding] ACTIVITIES," was sufficiently clear that it should have been enforced. *Id.* at 782. This specific statement did not contain the word "negligence," which the plaintiff claimed was fatal to the agreement. The court disagreed, however, and held that such legal terminology was not

required to uphold the agreement. *Id.* at 785. The court stated that "[t]he inquiry should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed. In the present case, the agreement was written in simple and clear terms that were free from legal jargon. It was not inordinately long or complicated." *Id.* (citation omitted).

▓ {31} We agree that this is the proper standard and that drafters of these agreements should err on the side of using clear terms, understandable by the general public, rather than legal terminology. That is not to say that legal terms will operate to void an agreement, but that they should not be relied upon exclusively to convey the meaning of the release to the person signing it. It is important that the release at issue in any particular case contain specific language informing the patron of the types of risks being assumed, regardless of whether the patron is well-versed in legal terms of art or not. *See Day v. Snowmass Stables, Inc.,* 810 F.Supp. 289, 294–95 (D.Colo.1993) (holding that a liability release was invalid because it did not explain the specific risks being assumed by the person who signed it).

▓ {32} We note that *Heil Valley Ranch* demonstrates another dilemma courts face when determining whether a liability release is sufficiently unambiguous. In that case, a narrow majority of the court agreed that the release at issue unambiguously released the defendant from liability for negligence, *see* 784 P.2d at 785, while several justices dissented, reasoning that the release appeared to release the defendant from liability only from the inherent risks of riding a horse, and not negligence, *id.* at 787 (Lohr, J., dissenting). The dissent did not disagree with the standard to be applied in determining whether the release was unambiguous. *Id.* Standing alone, the waiver language in the release appeared unambiguous. The dissent recognized, however, that the release began with a long recitation of the inherent dangers of horseback riding due to horses' unpredictable behavior. The sentence in the release that exculpated the defendant could then be interpreted to cover only liability for those risks, not the negligence of the defendant. *Id.* We note this fact to illustrate the reality that the very same words can mean different things to different people, and that context is important. We agree with the dissent in *Heil Valley Ranch* that the context surrounding any particular sentence in a liability release should be considered when determining its meaning. *Cf. Mark V, Inc. v. Mellekas,* 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) (discussing the importance of considering the circumstances surrounding the making of an agreement when determining whether any terms are ambiguous). The so-called "plain meaning" of a legal document can sometimes be elusive, even when it is possible to agree on what the drafters intended. *See State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994). This makes it all the more important that drafters of such releases be as careful as possible to convey the intent of the agreement in terms that both parties to the release can and do understand.

{33} Thus, we adopt a standard today for the strict construction of liability releases that requires such clarity that a person without legal training can understand the agreement he or she has made. Context is important; the words surrounding the portion being construed and the circumstances surrounding the agreement are relevant. We now consider the language of the release sought to be enforced in this case.

**B**

▓ {34} For the most part, the release in this case contains unintelligible and unhelpful language. The very last sentence of the release does convey the idea that the guest is agreeing not to hold Running Elk responsible for its own negligence. It says,

> I further agree to exculpate and relieve THE LODGE AT CHAMA and its employees, representatives and agents, from all liability for any loss, damage, or injury, whether to person or property which I may suffer while engaging in activities and/or using the lands of THE LODGE AT CHAMA all whether or not resulting from the negligent act or omission of another person or persons.

{35} Perhaps this sentence could have been more artfully or clearly drafted. It is

so long that a guest could forget what the first part of the sentence says by the time the guest reaches the end of the sentence. The guest should not have to struggle to understand the rights he or she is relinquishing. The clarity of the sentence presents a close question as to its sufficiency. At its core, however, the sentence says that "I ... relieve THE LODGE ... from all liability for ... injury ... resulting from the negligent act ... of another...." Read carefully enough, the guest should be able to understand its meaning. On balance, it has only one reasonable interpretation: it is an agreement not to sue the Lodge for injuries caused by the negligence of Lodge employees. As such, it is not ambiguous. This is especially true when it is considered in the context of the title of the document, "Agreement for Release and Assumption of Risk." Standing alone, "assumption of risk" is one of those legal phrases that one would not expect a lay person to understand, and would not be sufficient on its own to uphold the release. But, considered together with the language in the body of the document, the phrase is a helpful signal.

{36} In addition to the language of the release itself, courts look to the placement of that language within the document to determine whether it is conspicuous enough. *See Lynch,* 97 N.M. at 557, 627 P.2d at 1250. "When a reasonable person against whom a clause is to operate ought to have noticed it, the clause is conspicuous." *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 511 (Tex.1993). The release in this case does not suffer from a deficiency in this regard because it is part of a very short document that is appropriately labeled. *See id.* at 510 ("[I]ndemnity language [is] sufficiently conspicuous to afford fair notice of its existence when the entire contract appear[s] on one page and the language [is] on the front side of the contract, not hidden under a separate heading or surrounded by unrelated terms."). Further, the record indicates that Running Elk made some effort to bring the release to its guests' attention before signing it.

{37} We conclude that the release in this case expressed the intent of the parties that Berlangieri would not hold Running Elk liable for its negligent acts. Although much of the language of the release is unhelpful, considered as a whole, it is sufficiently clear. Thus, the first inquiry under *Lynch,* that we strictly construe the language of the release against the promisee, is not fatal to the agreement's enforceability.

### C

{38} The next inquiry under the *Lynch* framework that we must consider is whether the release is affected with a public interest such that it is unenforceable as contrary to public policy. *See Lynch,* 97 N.M. at 558–59, 627 P.2d at 1251–52. Public policy favoring the invalidation of a release can be furnished either through statutory or common law. *See id.* at 558, 627 P.2d at 1251.

{39} The Court in *Lynch* used the non-exclusive list of factors from *Tunkl* to determine whether public policy should operate to void the release. We adopt those factors for guidance as well.

[T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.[3] The party holds himself [or herself] out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his [or her] services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, sub-

ject to the risk of carelessness by the seller or his [or her] agents.

*Tunkl,* 32 Cal.Rptr. 33, 383 P.2d at 445–46 (footnotes omitted). As one might expect, it would be a rare case when a release exhibited all of these factors at once. *But see Tunkl,* 32 Cal.Rptr. 33, 383 P.2d at 447 ("[H]ere, the relationship fulfills all of [the factors]."). We also do not believe a simple balancing test is appropriate. It would be possible that only one of these factors would be applicable, but that factor would be significant enough to make the release unenforceable. These six factors are only indicators that are helpful in determining the larger question of whether enforcement of the release would be unjust.

{40} Berlangieri argues that the Equine Liability Act is dispositive of this question. The Act provides:

A. No person, corporation or partnership is liable for personal injuries to or for the death of a rider that may occur as a result of the behavior of equine animals while engaged in any equine activities.

B. No person, corporation or partnership shall make any claim against, maintain any action against or recover from a rider, operator, owner, trainer or promoter for injury, loss or damage resulting from equine behavior unless the acts or omissions of the rider, owner, operator, trainer or promoter constitute negligence.

C. Nothing in the Equine Liability Act shall be construed to prevent or limit the liability of the operator, owner, trainer or promoter of an equine activity who:

(1) provided the equipment or tack, and knew or should have known that the equipment or tack was faulty and an injury was the proximate result of the faulty condition of the equipment or tack;

(2) provided the equine and failed to make reasonable and prudent efforts to determine the ability of the rider to:

(a) engage safely in the equine activity; or

(b) safely manage the particular equine based on the rider's representations of his [or her] ability;

(3) owns, leases, rents or otherwise is in lawful possession and control of the land or facilities upon which a rider sustained injuries because of a dangerous condition that was known to the operator, owner, trainer or promoter of the equine activity;

(4) committed an act or omission that constitutes conscious or reckless disregard for the safety of a rider and an injury was the proximate result of that act or omission; or

(5) intentionally injures a rider.

NMSA 1978, § 42–13–4 (1993).

{41} Berlangieri argues that the Act imposes affirmative duties upon equine business operators to protect their patrons from harm under subsections one through five. Running Elk argues that this statute imposes no duty upon it. "However, it is also a general proposition that every person has a duty to exercise ordinary care for the safety of others, when that person does choose to act." *Davis v. Bd. of County Comm'rs,* 1999–NMCA–110, ¶ 15, 127 N.M. 785, 987 P.2d 1172 (internal quotation marks, brackets, and quoted authority omitted); *accord* UJI 13–1604 NMRA 2003. The relevant inquiry for this Court is not whether the Act imposes duties, but whether it generally expresses a policy that the duty of ordinary care may not be disclaimed in this context.

{42} "The starting point in statutory construction is to read and examine the text of the act and draw inferences concerning the meaning from its composition and structure." *Meridian Oil, Inc. v. N.M. Taxation & Revenue Dep't,* 1996–NMCA–079, ¶ 12, 122 N.M. 131, 921 P.2d 327 (quoting 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.01 (5th ed.1992)) (footnote omitted in original). We must also keep in mind that our primary goal is to give effect to the Legislature's intent. *State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995). In this case, the Equine Liability Act very clearly expresses a policy that equine operators should not be held liable for equine behavior. Section 42–13–4(A), (B). That is not disputed here. Subsection B contains the qualifier, however, "unless the acts or omissions of the ... operator ... constitute negligence." Running Elk takes the position that this phrase only serves to limit the definition of conduct for which it cannot be held liable. We agree that this phrase does

serve that purpose. We also believe, however, that the legislative intent goes further than that to express a policy that equine operators *should* be accountable for their own negligence.

{43} First, Subsection B, read as a whole, appears to state what operators may be held liable for, and for what they may not be held liable. One way to achieve this would be to describe one type of behavior in the negative (equine behavior), and the other type of behavior in the positive (negligence). That is what the subsection appears to do. The subsection begins by stating that no person shall be able to bring a claim against an operator for equine behavior. The second clause of the subsection, framed in the positive, can be similarly read as saying the opposite, that is, that any person shall be able to bring a claim against an operator for negligence. The Legislature used a manner of writing that evidences the intent that patrons of businesses such as Running Elk should be able to make claims against them for negligence, but not for equine behavior.

{44} We recognize that in the past this Court has applied a rule of construction that "statutes will be read strictly so that no innovation upon the common law that is not clearly expressed by the legislature will be presumed." *Sims v. Sims,* 1996–NMSC–078, ¶ 22, 122 N.M. 618, 930 P.2d 153. Our interpretation of the Equine Liability Act complements the common law, rather than supplants it. The public policy exception to the enforcement of liability releases is a common law doctrine. The Act provides the expression of policy that makes the exception applicable. *See Torres v. State,* 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) ("[I]t is the particular domain of the legislature, as the voice of the people, to make public policy."); *see also Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 392, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) ("It has always been the duty of the common-law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles...."); Roscoe Pound, *Common Law and Legislation,* 21 Harv. L.Rev. 383, 406 (1908) ("Formerly it was argued that common law was superior to legislation because it was customary and rested upon the con-

sent of the governed. Today we recognize that the so-called custom is a custom of judicial decision, not a custom of popular action.... We see in legislation the more direct and accurate expression of the general will.").

{45} Second, our conclusion regarding the policy of the statute is evidenced by the structure of Section 42–13–4 itself. We quoted the statute in its entirety to show that, by far, the bulk of the statute explains what types of activities equine operators may be held liable for, not activities for which they may avoid liability. Subsection C goes into considerable detail in this regard, while "equine behavior" is only briefly addressed. This suggests that the Legislature attempted to provide greater protection for patrons of equine activities in the Act than they otherwise would have enjoyed. The Act also serves the purpose of providing guidance as to what may be labeled as inherent risks of equine activities. Whether the Act was intended to impose affirmative duties upon operators is unclear, although it is notable that one other court, construing an equine liability act that is very similar to our own, came to this conclusion. *See Patrick v. Sferra,* 70 Wash.App. 676, 855 P.2d 320, 322–23 (1993); *see also* Terence J. Centner, *The New Equine Liability Statutes,* 62 Tenn. L.Rev. 997, 1036–37 (1995) (noting the lack of clarity in equine liability statutes as to whether they impose affirmative duties). We need not resolve this question, however. It is sufficient to conclude that the Act expresses in general terms a public policy of our Legislature that equine operators should be accountable for injuries due to their own fault.

{46} Section 42–13–4(A) provides that equine operators will not be liable for equine behavior, and Section 42–13–4(B) bars a cause of action unless the action is based on the negligence of the operator. Section 42–13–4(C) then proceeds to provide specific causes of injury which are not intended to be excluded either by Section 42–13–4(A) or (B). All of the examples within this subsection refer to acts of the operator, not the horse, and thus could not be characterized as equine behavior. *See* § 42–13–3(C) (defining " 'behavior of equine animals' " as "the propensity

of an equine animal to kick, bite, shy, buck, stumble, bolt, rear, trample, be unpredictable or collide with other animals, objects or persons"). Thus, the Act expresses in general terms a policy that operators should be held liable for negligence, but not for events beyond their control.

{47} We believe the Act would do little more than codify the common law as it exists if it were to only provide that, absent a release, operators may be held liable for their negligence but not for injuries caused by equine behavior that is not the operators' fault. The law of torts, with the exception of strict products liability, is a fault based system of recovery; without fault, there is no liability for injury. *See Scott,* 96 N.M. at 689, 634 P.2d at 1241 ("Liability based on fault is the cornerstone of tort law...."). So, under the common law, equine behavior that is not the result of negligence would not lead to liability, even if this statute did not exist. In other words, under Running Elk's interpretation of the Act, the Act would largely restate the law as it existed prior to its enactment. Although it is certainly within the legislature's prerogative to codify the common law, we think that the more reasonable interpretation of this statute is that the Legislature intended to express in general terms a public policy that operators should be held accountable for their own negligence, recklessness, and intentional conduct.

{48} Running Elk cites to NMSA 1978, § 42–13–2 (1993), entitled "Legislative purpose and findings" as support for its contention that upholding the liability release in this case would not violate the policies of the Equine Liability Act. The Act states the following:

The legislature recognizes that persons who participate in or observe equine activities may incur injuries as a result of the numerous inherent risks involved in such activities. The legislature also finds that the state and its citizens derive numerous personal and economic benefits from such activities. It is the purpose of the legislature to encourage owners, trainers, operators and promoters to sponsor or engage in equine activities by providing that no person shall recover for injuries resulting from the risks related to the behavior of equine animals while engaged in any equine activities.

*Id.*

{49} Contrary to Running Elk's assertion, we believe that disallowing liability releases for negligence furthers the purposes of the Act as expressed in Section 42–13–2. Specifically, this section states that the Legislature wishes to encourage equine activities, and it recognizes that people are injured during those activities. This section further explains that the Legislature should promote the personal benefits that those people receive from participating in these activities. Running Elk and amici take the position that we should only look at those benefits which the statute would confer upon equine businesses themselves. We do not think that the Act should be so narrowly construed. Section 42–13–2 references benefits received by patrons of equine activities, the State itself, and those who operate equine activities. In keeping with the legislative purpose of promoting equine activities, we believe that the Act was written to balance the sometimes competing interests of equine operators and their patrons. The policy of allowing patrons to hold equine operators liable for their negligence, found in Section 42–13–4, is consistent with the legislative findings and purpose, found in Section 42–13–2.

{50} Thus, the first *Tunkl* factor of suitability for public regulation, considering the public regulation that the Legislature has imposed on the equine industry in the Act, weighs in favor of holding unenforceable the release executed by Berlangieri. Given the Act's ambiguity, it would be a difficult question if this were the only factor that supports such a result. That is not the case, however. Most of the other factors weigh in favor of invalidating the release. The Lodge is a business that is open to the public. It does not require its patrons to meet criteria such as being experienced horseback riders before they may purchase the Lodge's services. Running Elk also did not offer a way for Berlangieri to expand his protection by purchasing additional coverage for injuries caused by Running Elk employees. Finally, it is clear that as a result of the release, Berlangieri was "subject to the risk of care-

lessness" by Running Elk's employees, considering the fact that he was a novice rider who could not independently verify that his saddle was mounted properly.

{51} In contrast, only two of the *Tunkl* factors weigh in favor of the release. First, recreational horseback riding has not been shown to be a service of "practical necessity" to the public, such as a utility service. *See Tunkl*, 32 Cal.Rptr. 33, 383 P.2d at 445; *Sw. Pub. Serv. Co.*, 67 N.M. at 118, 353 P.2d at 69. Second, Berlangieri was not subject to Running Elk's superior bargaining power. These two factors are interrelated because superior bargaining power is more likely to exist when the service is of practical necessity to the public. *See Milligan v. Big Valley Corp.*, 754 P.2d 1063, 1066–67 (Wyo.1988) ("A disparity of bargaining power will be found when a contracting party with little or no bargaining strength has no reasonable alternative to entering the contract at the mercy of the other's negligence. For example, a member of the public contracting with a public utility, common carrier, hospital or employer often has no real choice or alternative and is, therefore, at the mercy of the other party."). Although the release that was offered to Berlangieri was a printed form and there was no bargaining involved, Berlangieri was not forced to enter the contract to participate in a recreational enterprise with Running Elk. *See Lynch*, 97 N.M. at 557, 627 P.2d at 1250 (" 'Required to deal' " involves the absence of alternatives; specifically, whether plaintiffs were 'free to use or not to use' defendant's ... services.") (quoting *Valley Nat'l Bank v. Tang*, 18 Ariz.App. 40, 499 P.2d 991, 993 (1972)). We think these factors are not dispositive in this case, however, in light of the fact that all of the other factors weigh against enforcing the release.

{52} Applying the framework enunciated in *Lynch* and *Tunkl*, we conclude that the liability release executed by Running Elk and Berlangieri should not be enforced. The policy expressed by our Legislature in the Equine Liability Act weighs heavily in this determination, but it is not the sole basis. A review of all of the *Tunkl* factors applicable in this case leads us to this result. We do not think that it is appropriate to invalidate all recreational releases, but they must be strictly construed, and the policy implications of their enforcement must be considered. In this case, Running Elk is not entitled to summary judgment on the basis of the release signed by Berlangieri.

## IV

{53} We conclude that the policy generally expressed in the Equine Liability Act and other factors trigger the public policy exception to the general rule that liability releases for negligence are enforceable. As a result, the liability release executed by Berlangieri may not be enforced against him or his wife. We reverse and remand to the district court for further proceedings consistent with this opinion.

{54} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PATRICIO M. SERNA and RICHARD C. BOSSON, Justices.