The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: **July 11, 2024**

**No. A-1-CA-40098**

**TEAL PECK, as next friend for A.Z.,**
**a minor,**

    Plaintiff-Appellant,

v.

**G-FORCE GYMNASTICS ACADEMY, LLC**
**and LISA GRAVELLE,**

    Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**Christopher G. Perez, District Court Judge**

Law Offices of Marshall J. Ray, LLC
Marshall J. Ray
Albuquerque, NM

for Appellant

Resnick & Louis, P.C.
Harriett J. Hickman
Albuquerque, NM

for Appellees

**OPINION**

**YOHALEM, Judge.**

{1}     We are asked to decide whether a waiver of liability for future negligence, entered into by Plaintiff Teal Peck (Parent), on behalf of her minor child, A.Z. (Child), is enforceable by Defendants G-Force Gymnastics Academy, LLC and its owner, Lisa Gravelle (collectively, G-Force). G-Force is a business offering gymnastics facilities, training, and competition to children in Albuquerque, New Mexico. Child, a student at G-Force, suffered a serious ankle injury during vault practice. Parent filed a complaint in district court on Child's behalf seeking damages for the injury to Child allegedly caused by G-Force's negligent placement of gymnastics equipment. G-Force moved for summary judgment claiming that the waiver of liability for negligence in its contract for services to Child, signed by Parent, barred Parent's action. Applying the analysis adopted by our Supreme Court in *Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, 134 N.M. 341, 76 P.3d 1098, the district court found that the contract provision waiving G-Force's liability for negligence "is clear and unambiguous to a layperson" and that under the factors articulated by the California Supreme Court in *Tunkl v. Regents of University of California*, 383 P.2d 441 (Cal. 1963) (en banc) and adopted by this Court in *Lynch v. Santa Fe National Bank*, 1981-NMCA-055, 97 N.M. 554, 627 P.2d 1247, New

Mexico public policy does not prohibit a parent from waiving liability for negligence on behalf of their minor child in a contract for recreational services. We affirm.

**BACKGROUND**

{2}     Child was enrolled at G-Force starting in 2013, when she was seven years old. Child trained in gymnastics at G-Force and competed as a member of G-Force's gymnastics team on the vault, uneven parallel bars, balance beam, and floor categories.

{3}     On November 3, 2016, when Child was ten years old and had been a student of gymnastics at G-Force for three years, Parent electronically signed a contract enrolling Child in an advanced gymnastics training and competition program at G-Force. The contract included terms of payment and the waiver of liability at issue in this case. The waiver of liability consists of the following relevant paragraphs:

> **WAIVER/RELEASE**
> G-Force Gymnastics Academy or the coaching staff will not be held liable or financially responsible for accidental injury of any nature. The undersigned hereby remise, release, and forever discharge G-Force. . . , administrators and employees from all actions, causes of action, claims and demands whatsoever, whether or not well founded in fact or in law, and from all suits.
>
> . . . .
>
> **RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK, AND INDEMNITY AGREEMENT ("AGREEMENT")**
> In consideration of participating in activities at G-Force . . . , I represent that I understand the nature of these activities and that I am qualified, in good health, and in proper physical condition to participate in such Activity. I acknowledge that if I believe event conditions are unsafe, I

2

will immediately discontinue participation in the activity. I fully understand that these activities involves risks of serious bodily injury, including permanent disability, paralysis and death, which may be caused by my own actions, or inactions, those of others participating in the event, the conditions in which the event takes place, or the negligence of the "releas[e]es" named below; and that there may be other risks either not known to me or not readily foreseeable at this time; and I fully accept and assume all such risks and all responsibility for losses, cost, and damages I incur as a result of my participation in these activities. I hereby release, discharge, and covenant not to sue G-Force . . . , its respective administrators, directors, agents, officers, volunteers, and employees, other participants, any sponsors, advertisers, and, if applicable, owners and lessors of premises on which the Activity takes place, (each considered one of the "RELEASEES" herein) from all liability, claims, demands, losses, or damages, on my account caused or alleged to be caused in whole or in part by the negligence of the "releasees" or otherwise, including negligent rescue operations and future agree that if, despite this release, waiver of liability, and assumption of risk, I or anyone on my behalf, makes a claim against any of the Releasees, I will indemnify, save, and hold harmless each of the Releasees from any loss, liability, damage, or cost, which may incur as the result of such claim.

I have read the RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK, AND INDEMNITY AGREEMENT, understand that I have given up substantial rights by signing it and have signed it freely and without any inducement or assurance of any nature and intend it to be a complete and unconditional release of all liability to the greatest extend allowed by law and agree that if any portion of this agreement is held to be invalid the balance, notwithstanding, shall continue in full force and effect.

**PARENTAL CONSENT**
AND I, the minor's parent and/or legal guardian, understand the nature of the above referenced activities and the [m]inor's experience and capabilities and believe the minor to be qualified to participate in such activity. I hereby Release, discharge, covenant not to sue and AGREE TO INDEMNIFY AND SAVE AND HOLD HARMLESS each of the Releasees from all liability, claims, demands, losses or damages on the minor's account caused or alleged to have been caused in whole or in

part by the negligence of the Releasees or otherwise, including negligent rescue operations, and further agree that if, despite the release, I, the minor, or anyone on the minor's behalf makes a claim against any of the above Releasees, I WILL INDEMNIFY, SAVE AND HOLD HARMLESS each of the Releasees from any litigation expenses, attorney fees, loss liability, damage, or cost any Releasees may incur as the result of any such claim.[1]

{4}     On December 21, 2018, Child, who was then twelve years old, was seriously injured during vault practice at G-Force. Plaintiff filed a complaint against G-Force alleging that on the day of Child's injury, G-Force had "rearranged the gymnastics academy, including moving the vaults, foam pit, and mats" and that G-Force staff had negligently moved the vaults "unreasonably close to each other." The complaint alleges that the negligent placement of the vaults caused Child's right foot to hit a mat instead of the protective foam in the landing pit as she was completing a vault, causing a serious ankle injury. In its answer, G-Force denies the allegation that its staff was negligent in the set-up of the equipment, or that its negligence of its employees caused Child's injury.

{5}     Prior to trial, G-Force filed a motion for summary judgment seeking dismissal of the complaint based on Parent's waiver of liability for negligently-caused injuries to Child. G-Force claimed that "[Parent] signed an enforceable [w]aiver and explicitly agreed that she would release, discharge and covenant not to sue [G-Force]

---

[1]The contract includes an indemnity provision. Neither party has raised the enforceability of this provision in the district court or in this Court. We, therefore, do not consider that issue.

4

even if [Child] suffered injuries alleged to be caused in whole or in part by [G-Force's] negligence." G-Force argued that New Mexico recognizes that a party to a contract may explicitly assume risk, and that "[r]eleases of liability will generally be enforced," citing *Berlangieri*, 2003-NMSC-024, ¶ 17. Both parties focused their arguments on *Berlangieri*, and the factors adopted by our Supreme Court to determine when an exception to the general rule that waivers of liability for negligence will be enforced applies.

{6}     The district court, as requested by both parties, applied the two-step process adopted by *Berlangieri*, first determining that the release was sufficiently clear to inform a layperson that they were giving up their right to sue for any injury to Child, including an injury caused by G-Force's negligence. The district court rejected Parent's argument that the agreement's description of the risks of gymnastics was insufficient to put Parent on notice of the risks she was accepting on Child's behalf, and concluded that the *Tunkl* factors "weigh in favor of Defendants." The district court also rejected Parent's argument that, rather than relying on the *Tunkl* factors, the court should adopt the position taken by the majority of the courts of other states: holding that allowing a parent to waive liability for negligence on behalf of their child violates that state's public policy protecting children. Concluding that the waiver of liability for negligence is enforceable, the district court granted G-Force's motion for summary judgment and dismissed with prejudice. Parent appeals.

# DISCUSSION

## I.   Standard of Review

{7}   "Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. The facts here are undisputed and only a legal interpretation of those facts remains for this Court on appeal. We, therefore, apply a de novo standard of review. *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 5, 137 N.M. 339, 110 P.3d 1076.

## II.   The Governing Principles of Law

{8}   We first address the principles of law applicable to the question of whether waivers of liability for negligence will be enforced in New Mexico. The parties and the district court have rightly turned to our Supreme Court's decision in *Berlangieri*, both because it is the most recent review of New Mexico law concerning waivers of liability and because the waiver addressed by *Berlangieri* was for physical injuries negligently caused by a recreational activity, in that case, horseback riding. Our Supreme Court concluded that under New Mexico law, the waiver of liability for negligence was unenforceable based on New Mexico public policy. *Berlangieri*, 2003-NMSC-024, ¶ 53. Notably, however, our Supreme Court in *Berlangieri* refused to approve the broad limitation on all waivers of liability for negligently-caused physical injury—the approach then taken by this Court. Rejecting this

6

Court's assessment of the public interest as heavily weighted toward tort principles of protection from injury, and encouraging the exercise of reasonable care, *see id.* ¶¶ 20-22, our Supreme Court instead concluded that New Mexico public policy weighs equally the public interest in encouraging reasonable care under our tort law and freedom to contract under our common law of contracts. *Id.* ¶ 20 (holding that New Mexico's policy of freedom to contract is "no less important to society as a whole and the common good than those policies that undergird the law of tort"). Our Supreme Court ultimately concluded that, in the absence of a clear policy derived from New Mexico common law, any policy broadly invalidating waivers of liability for negligence must come from our Legislature. *Id.* ¶ 15.

{9}     Turning then to look specifically at New Mexico precedent addressing waivers of liability, our Supreme Court noted that like most jurisdictions, New Mexico had adopted the Restatement (Second) of Torts § 496(B) (1965), which states that "[a] plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy." *Berlangieri*, 2003-NMSC-024, ¶ 18 (internal quotation marks and citation omitted). Noting that the then recently adopted Restatement (Third) of Torts: Apportionment Liability § 2 (2000), had not modified this principle, *see Berlangieri*, 2003-NMSC-

024, ¶ 18, the Court reaffirmed the general rule in New Mexico that "liability releases for personal injury may be enforced in limited circumstances." *Id.* ¶ 27.

{10} Our Supreme Court then turned to discuss the standards that should be applied by New Mexico courts to determine if, under the circumstances of a given case, an exculpatory agreement is unenforceable. Looking to this Court's decision in *Lynch*, 1981-NMCA-055, ¶ 16, our Supreme Court identifies as the first relevant consideration that "exculpatory clauses are construed strictly against the drafter." *Berlangieri*, 2003-NMCA-024, ¶ 28. Strict construction, the Court explains, is necessary because a waiver must be voluntary to be enforceable, and a plaintiff can assume a risk voluntarily only if the terms of the agreement are clear and unequivocal, such that they can be understood by someone who has no legal training. *Id.* ¶¶ 29-31. The contract must inform the patron of the types of risks involved, disclosing any hidden risks, and must not rely exclusively on legal terms to explain the nature of the rights being waived. *Id.* The Court notes that in assessing the clarity of a waiver, "[c]ontext is important; the words surrounding the portion being construed and the circumstances surrounding the agreement are relevant." *Id.* ¶ 33. In addition to the language of the release itself, and the surrounding circumstances, "courts look to the placement of that language within the document to determine whether it is conspicuous enough." *Id.* ¶ 36.

{11} If the waiver clause is sufficiently clear and unambiguous, then whether the waiver is enforceable turns on public policy. Again relying on this Court's decision in *Lynch*, 1981-NMCA-055, ¶ 20, our Supreme Court adopted the list of factors in *Tunkl* to guide our courts in determining whether public policy should operate to void a waiver. *Berlangieri*, 2003-NMSC-024, ¶ 39. *Tunkl* provides that a waiver or release of liability is invalid when the transaction "exhibits some or all of the following characteristics":

> [1] It concerns a business of a type generally thought suitable for public regulation.

> [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

> [3] The party holds [themselves] out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

> [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks [their] services.

> [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay reasonable fees and obtain protection against negligence.

> [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or [their] agents.

*Berlangieri*, 2003-NMSC-024, ¶ 39 (quoting *Tunkl*, 383 P.2d at 445-46 (footnotes omitted)). In applying these factors, "a simple balancing test is [not] appropriate." *Id.* These six factors provide only helpful guidance "in determining the larger question of whether enforcement of the release would be unjust." *Id.*

{12}    We now apply the principles identified by our Supreme Court in *Berlangieri* to the G-Force waiver, first determining whether this waiver is clear and unambiguous, and then considering each of the *Tunkl* factors to decide whether enforcement of this waiver "would be unjust" as a matter of New Mexico public policy. 2003-NMSC-024, ¶ 39.

**III.    The Agreement Clearly and Unambiguously Waives the Liability of G-Force for Negligence**

{13}    The district court found that the language of the agreement, even when strictly construed, met the test established by *Berlangieri*—that the waiver of liability for negligence by G-Force was stated in a way that was understandable to a layperson. In particular the court found that a layperson would understand that they were giving up their rights to sue G-Force for any reason, including negligence. We agree with the district court's analysis.

{14}    Although the agreement is overly long and repetitive, it provides, under the bolded heading, "**Waiver/Release**" at the top of the document, that Parent agrees that G-Force "will not be held liable or financially responsible for accidental injury of any nature." Although this statement, standing alone, might not be sufficiently

clear to withstand strict construction, under the bolded heading, "**Parental Consent**," at the bottom of the document, Parent is asked to agree to "[r]elease, discharge, and covenant not to sue [G-Force] . . . from all liability, claims, demands, losses or damages . . . caused in whole or in part by the negligence of the Releasees or otherwise, including negligent rescue operations." The inclusion of the agreement "not to sue [G-Force]" followed by the specific mention of liability or damages "caused in whole or in part by the negligence of the Releasees . . . , including negligent rescue operations," is sufficient to alert a reasonable parent that they are giving up the right to sue G-Force specifically for negligence. This language does not create the sort of confusion found in some other waivers about whether suit is being waived only if an injury is due to the inherent risks of the activity or sport. Here, the word "negligence" with reference to G-Force is specifically included in the waiver. Like the language in the release reviewed in *Berlangieri*, this language has only one reasonable interpretation: it is an agreement not to sue G-Force for injuries to Child caused by the negligence of G-Force. We conclude that the agreement adequately expresses the intent of the parties that Parent will not hold G-Force liable for its negligent acts.

{15}     Parent claims that, even if the language of the agreement waiving her right to sue G-Force for negligence is clear and understandable, the agreement should have specifically described all of the risks of injury attributable to gymnastics. The

11

agreement describes the risks of injury by focusing on the demands of the sport of gymnastics on the body: "[a]ny activity which involves motion, inversion, height, contact, speed, and rotation of the human body (such as Gymnastics) has the potential for severe accidental injury." In the next paragraph, the agreement states that "these activities involve[] risks of serious bodily injury, including permanent disability, paralysis and death."

{16}   We are not persuaded that these descriptions of the risks associated with gymnastics need to be any more specific to put Parent on notice that Child could suffer an ankle injury when landing from a vault, an activity which involves all of the body movements listed in the general description of the risk of injury from gymnastics—height, inversion, rotation in the air, speed, and contact when landing. Of the many possible injuries from gymnastics, an injury to an ankle upon landing from a vault is a sort of injury that should be known and potentially expected given the nature of the training and competition provided by G-Force.

{17}   Finally, we determine that the release was conspicuous enough in the short, one-page document to afford fair notice of its existence. The document title itself, at the top of the page contains both the term "release" and "waiver." The subheadings also contain the terms "release" and "waiver," as well as the term "consent." Indeed, with the exception of one paragraph concerning terms of payment, the entire document concerns waiver of liability. Although the typeface on the printed exhibit

is significantly smaller than the 14-point typeface used by this Court in this opinion, the original document was an electronic document, which was read and signed by Parent electronically. We recognize that the size of the print is readily adjustable on a computer, and, therefore, do not find the typeface to be a significant impediment to Parent's review of the terms of the agreement.

**IV.  New Mexico Public Policy Allows a Parent to Waive Liability for Negligence on Behalf of Their Child**

{18}    We turn now to examine whether a waiver of liability for the negligence of a recreational facility signed by a parent on behalf of their minor child "is affected with a public interest such that it is unenforceable as contrary to public policy." *Berlangieri*, 2003-NMSC-024, ¶ 38. This requires us to apply the six *Tunkl* factors to "determine whether public policy should operate to void the [waiver]." *Id.* ¶ 39. In applying these factors, "a simple balancing test is [not] appropriate." *Id.* Our Supreme Court cautions that these six factors provide only helpful guidance "in determining the larger question of whether enforcement of the release would be unjust." *Id.*

{19}    The first *Tunkl* factor (factor one) looks at legislation, and rules or regulations that either directly set applicable policy or address issues from which public policy can be inferred. The next four factors (factors two through five) focus on whether the contract is procedurally unconscionable—a contract of adhesion—making the waiver of liability not truly a voluntary agreement between the parties. The final

factor (factor six) looks to whether the facility exercises such a degree of control over person or property that it would be substantively unfair or unconscionable to allow a customer to waive the facility's liability.

{20}    Parent argues that this Court should adopt what is described as the majority view of the courts of other states that have considered the question of a parent's authority to waive liability for negligence when their child engages in a recreational activity or sport. We understand this argument to be addressed to the first *Tunkl* factor—legislation, rules, or regulations that set public policy. Parent argues that *Tunkl* factors three, five, and six—addressing aspects of procedural and substantive unconscionability—also support a conclusion that the G-Force waiver violates New Mexico public policy.

{21}    We construe *Berlangieri* to require this Court to consider each of the *Tunkl* factors that apply to the circumstances here, considering briefly, as well, those factors that do not apply, before making the difficult decision about whether any single factor or combination of factors create an exception to the general rule in New Mexico that waivers of liability for negligence are enforceable.

**A.    *Tunkl* Factor One: Legislation and Public Regulation**

{22}    We begin with the first *Tunkl* factor: whether the transaction "concerns a business of a type generally thought suitable for public regulation." *Berlangieri*, 2003-NMSC-024, ¶ 39 (internal quotation marks and citation omitted). In

14

*Berlangieri*, our Supreme Court explored, under the auspices of this factor, New Mexico legislation, rules and regulations that addressed the liability of lodges that offer horseback riding to guests or customers. The Court relied on the Equine Liability Act, NMSA 1978, §§ 42-13-1 to -5 (1993, as amended through 1995), which addresses the liability for physical injury of facilities offering horseback riding to the public. *See Berlangieri*, 2003-NMSC-024, ¶ 12. Although the Court found that the terms of the Equine Liability Act did not directly resolve the question before the Court about whether a waiver of liability for the negligence of a stable is enforceable, the Court found the Act relevant to its assessment of New Mexico's public policy. *Id.* (rejecting the view that the Equine Liability Act is not a relevant part of the Court's assessment of New Mexico public policy, even though it did not directly resolve the question before the Court). The Court found that the legislative intent of the Equine Liability Act "expresses a policy that equine operators *should* not be held liable" for their own negligence, *id.* ¶ 42, while relieving operators from liability for injuries caused by equine behavior, over which the operators have no control. The policy expressed by the Legislature in the Equine Liability Act ultimately was found to "weigh[] heavily," together with other applicable *Tunkl* factors, in the Court's determination that the lodge's waiver of liability for negligence should not be enforced. *Id.* ¶ 52.

{23} With our Supreme Court's approach to the first *Tunkl* factor in mind, we turn to Parent's policy argument. Parent begins by acknowledging the absence of a statute or common law precedent in New Mexico directly addressing the enforceability of a waiver of negligence entered into by a parent on behalf of a child. Parent then turns to the opinions of the courts of other states that have directly addressed this issue in the context of contracts for recreational activities. Parent correctly points out that the majority of the state courts to consider the issue have found such a waiver unenforceable, and contends that this Court should adopt the majority position. *See Galloway v. State*, 790 N.W.2d 252, 258 (Iowa 2010) ("Like a clear majority of other courts deciding such releases are unenforceable, we believe the strong policy in favor of protecting children must trump any competing interest of parents and tortfeasors in their freedom to contractually nullify a minor child's personal injury claim before an injury occurs.").

{24} Our examination of the cases cited by Parent reveals that the state courts that have not allowed parents to waive liability on behalf of their minor children have uniformly relied on state legislation, regulations, rules or longstanding common law prohibiting parents from agreeing to a settlement for their child in a tort action without the approval of a court. These cases reason that a parent who does not have the authority to "unilaterally release a child's claims *after* a child's injury," also "does not have the authority to release a child's claims *before* an injury." *Hawkins*

16

*ex rel. Hawkins v. Peart*, 2001 UT 94, ¶ 13, 37 P.3d 1062, *superseded by statute as stated in Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, 301 P.3d 984. This state policy requiring judicial approval to settle a child's claim is the foundation of every out-of-state case relied on by Parent on appeal. *See, e.g.*, *Miller ex rel. E.M. v. House of Boom Kentucky, LLC*, 575 S.W.3d 656, 662 (Ky. 2019) (holding that "children deserve as much protection from the improvident compromise of their rights before an injury occurs as [Kentucky] common law and statutory schemes afford them after the injury" (alterations, internal quotation marks, and citation omitted)); *Hojnowski ex rel. Hojnowski v. Vans Skate Park*, 901 A.2d 381, 386 (N.J. 2006) (noting that pursuant to New Jersey statute, a parent could not settle a minor child's tort claim without court approval, and holding that the purposes underlying the prohibition against a parent settling a minor child's tort claim after a cause of action accrues apply equally to a prospective waiver of negligence); *Scott ex rel. Scott v. Pac. W. Mountain Resort*, 834 P.2d 6, 11-12 (Wash. 1992) (en banc) (noting that a Washington statute prohibits a parent from releasing a minor child's cause of action after injury, and concluding that "[s]ince a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has the authority to release a child's cause of action prior to an injury").

{25}    In contrast to these out-of-state cases relied on by Parent, New Mexico does not have either a statute, common law doctrine, regulation, or court rule that prohibits

17

a parent from settling a civil suit on behalf of their minor child. *See Shelton v. Sloan*, 1999-NMCA-048, ¶ 41, 127 N.M. 92, 977 P.2d 1012. New Mexico has "a statute requiring judicial approval of settlements on behalf of incapacitated persons," *id.*; *see* NMSA 1978, § 38-4-16 (2009), but that statute specifically excludes minors. *See* NMSA 1978, § 38-4-14 (1989). A parent is permitted to serve as their minor child's next friend in a suit to recover property, debt, or damages. *See* NMSA 1978, §§ 38-4-7 to -13 (1897, as amended through 1975); *see also* Rule 1-017 NMRA. None of these statutes or Rule 1-017 requires court approval for a next friend to release or settle a child's claim. Although this Court has noted that "[w]hen a minor is a party, . . . it is apparently common practice for the district court to review the settlement to determine whether it is fair to the child," *Shelton*, 1999-NMCA-048, ¶ 39, this informal practice is not the same as a declaration of policy by our Legislature or a common law doctrine requiring such approval.

{26}     We also have not found indirect policy support in other areas of New Mexico law concerning parental authority. New Mexico respects a parent's authority to make decisions on behalf of their child with only limited exceptions: where a parent has been found to be unfit, and therefore, unable to act in the best interests of their child; or where there is a conflict of interest between the child and the parent; or between two parents with differing positions. *See Kimbrell v. Kimbrell*, 2014-NMSC-027, ¶ 18, 331 P.3d 915 (holding that "a parent does not have standing to bring such a

lawsuit [on behalf of their child] because the custody court has already determined that the parent is incapable of acting in the best interests of the child"); *Collins ex rel. Collins v. Tabet*, 1991-NMSC-013, ¶ 28, 111 N.M. 391, 806 P.2d 40 (noting that parents can no longer represent their child where there is a conflict of interest as to a settlement). Although it is the policy of our courts to be "especially solicitous of the rights of juveniles," *State v. Hunter*, 2001-NMCA-078, ¶ 12, 131 N.M. 76, 33 P.3d 296, and it is often stated that "[a] minor in court is represented not only by the guardian ad litem or next friend, but by the court itself," *Shelton*, 1999-NMCA-048, ¶ 42 (alterations, internal quotation marks, and citation omitted), we do not equate this policy with the statutes or common law in other states that deny a parent the authority to settle a claim on their child's behalf without court approval.

**B.      *Tunkl* Factors Two through Six**

{27}      Parent contends that, even if there is no dispositive statute or common law policy, the remaining *Tunkl* factors, particularly the third, fifth, and sixth factors—(3) that G-Force offers its services to "any member of the public"; (5) that G-Force "confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence"; and (6) "as a result of the transaction, . . . the purchaser is placed under the control of the seller, subject to the risk of carelessness

by the seller"—make this waiver unenforceable. *Berlangieri*, 2003-NMSC-024, ¶ 39 (internal quotation marks and citation omitted).

{28} We note that Parent does not contend that the recreational service provided by G-Force is "a service of great importance to the public, which is often a matter of practical necessity for some members of the public," the second *Tunkl* factor. *Id.* (internal quotation marks and citation omitted). Only a handful of essential public services have been identified as of sufficient public importance to justify a prohibition on a disclaimer of liability for negligence. These include public utilities, medical care, and in some jurisdictions, residential leases. *See, e.g.*, *Sw. Pub. Serv. Co. v. Artesia Alfalfa Grower's Ass'n*, 1960-NMSC-052, ¶ 36, 67 N.M. 108, 353 P.2d 62 (holding that a public service corporation, or a public utility such as an electric company, "cannot validly contract against its liability for negligence in the performance of a duty of public service, since such stipulation would be in contravention of public policy"); *Tunkl*, 383 P.2d at 447 (medical care); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 5.2, at 14 (2d ed. 1998) (residential leases). The failure to satisfy the second factor, concerning when a public service is essential, also rules out the fourth *Tunkl* factor that "[a]s a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength." *Berlangieri*, 2003-NMSC-024, ¶ 39 (internal quotation marks and citation omitted).

{29} Recognizing that the second and fourth factors operate together and that neither is satisfied here, Parent turns to the third factor. The third *Tunkl* factor addresses unequal bargaining strength when a service is not essential. Parent argues that the third factor is satisfied because G-Force is a business that is open to the public without restriction, and that G-Force does not require children to meet criteria such as being experienced gymnasts before they can enroll in G-Force's classes. Although it is undisputed that G-Force enrolls children of all ages and ability levels in its program, the summary judgment record focuses on Child and does not establish whether G-Force requires a waiver of liability for negligence for younger children, who are novices. The undisputed facts on summary judgment show that Child had three years of experience in gymnastics classes at G-Force and was a competitive gymnastics team member when Parent signed the release of liability at issue in this case. We note that neither party presented any evidence about whether other gymnastics programs were available to Child that did not require a waiver of liability for negligence. Such availability would be relevant to the relative bargaining strength of the parties. Given these gaps in the evidence, this factor thus weighs in favor of disallowing the liability waiver, but not as strongly as Parent argues.

{30} We agree with Parent that *Tunkl* factor five, which addresses whether this is a standardized adhesion contract of exculpation, without provision to pay extra for protection against negligence, weighs in favor of invalidating the release. The

contract is prepared by G-Force, and its terms do not invite bargaining. Similarly, *Tunkl* factor six—that child is under the control of the staff of G-Force and subject to the risk of their carelessness in setting up the equipment—weighs in favor of invalidating the release. Although Child was a skilled gymnast and likely capable of identifying obvious shortcomings in the setup of the gymnastics equipment, we agree with Parent that Child was subject to the risk of G-Force's carelessness in placing the vaults and mats that allegedly were the cause of her injury.

{31} Looking at all *Tunkl* factors—as our precedent establishes is the process by which this analysis must be undertaken and resolved—we are not persuaded that those few that favor invalidation of Parent's waiver of liability for negligence are sufficient to support a public policy exception to the general rule in New Mexico that waivers of liability for negligence will be enforced. We note that our Supreme Court in *Berlangieri* relied heavily on the policy expressed by our Legislature in the Equine Liability Act to conclude that the *Tunkl* factors weighed in favor of holding that "equine operators should be accountable for injuries due to their own fault." 2003-NMSC-024, ¶ 45. Although the Court stated that the policy expressed by our Legislature in the Equine Liability Act "is not the sole basis" for its decision, and that "[a] review of all of the *Tunkl* factors applicable in this case leads us to this result," the Court nonetheless acknowledged that the Equine Liability Act "weighs heavily in this determination." *Id.* ¶ 52. On the question of parental authority at the

22

heart of this case, in contrast, there is no affirmative expression by our Legislature of an intent to limit parental authority to make decisions for their children about the risks and benefits of various recreational activities, and New Mexico law allows fit parents to make important decisions for their children with a rare exception where there is a conflict of interest.

{32}     We do not find the three *Tunkl* factors that weigh at least somewhat in favor of invalidating the waiver sufficient to tip the balance of the public interest. Recreational activities are not essential services. We cannot conclude that a local gymnastics academy has a decisive advantage in bargaining strength so that invalidation of the waiver is required on the basis of the unconscionability of the agreement under the *Tunkl* factors. Factor six—that Child, because of her age, was subject to an increased risk from G-Force's carelessness—is the strongest factor favoring voiding the waiver. Our Supreme Court, in *Berlangieri*, however, was clear that the tort policy of protecting the public against carelessness could not be considered alone, apart from the equally strong countervailing policy providing for freedom of contract. 2003-NMSC-024, ¶ 20.

{33}     We, therefore, agree with the district court that the *Tunkl* factors do not support the invalidation of Parent's waiver of liability on behalf of Child in this recreational services contract. Public policy in New Mexico allows parents to weigh the benefit to their child of participation in a recreational activity against the risk of

personal injury. Our Legislature has adopted policies by statute for only two kinds of recreational activities—skiing and equine activities. *See* NMSA 1978, §§ 24-15-1 to -14 (1969, as amended through 2023) (Ski Safety Act); §§ 42-13-1 to -5 (Equine Liability Act). Neither statute separately addresses waiver of liability in the context of children participating in these sports.

{34} Courts are generally less well-equipped to address complex policy issues than legislatures. We, therefore, believe that public policy addressing waivers of liability by parents for recreational activities must come from our Legislature. *See Torres v. State*, 1995-NMSC-025, ¶ 10, 119 N.M. 609, 894 P.2d 386 ("[I]t is the particular domain of the [L]egislature, as the voice of the people, to make public policy.").

**CONCLUSION**

{35} For the reasons stated, we affirm the district court's dismissal with prejudice.

{36} **IT IS SO ORDERED.**

_____
**JANE B. YOHALEM, Judge**

**I CONCUR:**

_____
**J. MILES HANISEE, Judge**

**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation, dissenting**

24

**BUSTAMANTE, Judge, retired, sitting by designation (dissenting).**

{37}     I respectfully dissent. I would hold that parents cannot waive potential tort claims on behalf of their minor children in circumstances such as this. In my view, the majority's contrary holding is driven by two factors. First, following the district court's lead, the majority improperly injects the *Tunkl* factors into the parental consent/waiver analysis. *Maj. op.* ¶ 18. Second, I believe the majority is over-reading the foreign cases that have considered the issue of a parent's ability to waive their child's potential tort claims. *Id.* ¶ 24. I conclude that there is ample authority in New Mexico for this Court to limit parental authority here. I also disagree with the majority's conclusion that G-Force's waiver form is unambiguous.

**Parental Waiver of a Child's Tort Claims**

{38}     In paragraph 18 of its opinion, the majority explicitly tethers its analysis of the parental waiver issue to the six *Tunkl* factors, saying that its task is to determine whether there is a public interest at work that makes parental waivers unenforceable. The majority also asserts that *Berlangieri* requires use of the *Tunkl* factors in the inquiry. *Maj. op.* ¶ 18.

{39}     I simply disagree. *Tunkl* has become a foundational opinion providing a framework for analysis of exculpatory provisions purporting to protect defendants from the consequences of their negligence. *Berlangieri*, 2003-NMSC-024, ¶ 17. *Tunkl*'s focus is on the nature of the interaction between the defendants and their

adult customers, clients, and users. 383 P.2d at 441-42. *Tunkl*'s six factor inquiry takes into account the service or product provided by the defendant and the relative bargaining power balance between the defendant and its consumers. *Berlangieri*, 2003-NMSC-024, ¶ 39. The information drawn from the *Tunkl* factors informs the decision as to whether releasing the defendant from liability adversely affects the "public interest such that it is unenforceable as contrary to public policy." *Berlangieri*, 2003-NMSC-024, ¶ 38.

{40} The *Tunkl* factors say nothing about whether parents should be allowed to execute waivers of liability binding their children. *Berlangieri*, 2003-NMSC-024, ¶ 39. That inquiry involves a set of considerations unique to the status of children and to the child-parent relationship that *Tunkl* was not intended to—and does not— take into account. As the court in *Hawkins* noted, "[W]e need not reach the question of whether to adopt the *Tunkl* . . . standard, or any other standard generally relating to the public interest exception, because, in deciding the case before us, we rely on a public policy exception specifically relating to releases of a minor's claims." 2001 UT 94, ¶ 10. The court in *Scott* echoed that theme when it noted, "Although we adhere to prior Washington law that an adult sports participant can waive liability for another's negligence, we consider this a very different question than whether parents can release another for negligence which injures their child." 834 P.2d at 493.

26

{41} Because it does not deal with the parental waiver issue as a separate—and primary—matter, the majority opinion in effect decides that Parent here could waive Child's tort claims because the waiver would be enforceable had an adult signed it for themselves. *Maj. op.* ¶ 33. If that were the proper analysis, there would be no need to ever delve into the issue of whether parents can waive their child's potential tort claims. The parent/child relationship would be irrelevant to the inquiry. But that is not the tenor of the authorities. None of the cases cited to us by the parties, or the cases cited by those cases, or the cases revealed in my research have approached the issue in that manner.[2]

{42} Analyzing whether a parent can waive their child's prospective tort claims as a stand-alone issue, I come to a different conclusion. I start with the unremarkable observation that minors are treated differently under the law than adults. As the Court of Appeals of New York observed 110 years ago, "Infants are the wards of the courts, and our rules of practice abound in provisions of ancient origin designed to safeguard their legal rights." *Greenburg v. N.Y. Cent. & Hudson River R.R. Co.*, 210 N.Y. 505, 509 (N.Y. 1914); *id.* at 509, 512-13 (affirming lower court rulings setting aside a satisfaction of judgment approved by the plaintiff's father as guardian eight

---

[2]One opinion used *Tunkl* for its public policy analysis, but only after it noted that, unlike other states, Maryland had enacted a statute that explicitly allowed parents to settle their minor children's tort claims without getting court approval. *BJ's Wholesale Club, Inc. v. Rosen*, 80 A.3d 345 (Md. 2013).

years before when the plaintiff was eleven years old because the guardian had not complied with a statute requiring posting of a bond to secure the minor's settlement fund). Our Supreme Court made the same observation—though less emphatically—in *Bonds v. Joplin's Heirs*, 1958-NMSC-095, ¶ 9, 64 N.M. 342, 328 P.2d 597, where it affirmed a judgment overturning probate proceedings because the minor heirs had not been properly joined even though a pro forma guardian ad litem had been appointed to represent their interests. *See Haden v. Eaves*, 1950-NMSC-050, ¶¶ 13-30, 55 N.M. 40, 226 P.2d 457 (reviewing of the issue in the context of a quiet title action). This Court relied on *Bonds* and *Haden* to hold that courts are required to "reject a Rule 1-068 [NMRA] settlement on behalf of a minor if it is unfair to the minor." *Shelton v. Sloan*, 1999-NMCA-048, ¶ 42, 127 N.M. 92, 977 P.2d 1012. Noting that there is no specific statute or rule governing settlements of claims on behalf of minors, we concluded that the "power of the minor's representative with respect to settlements is therefore left to the common law." *Id.* ¶ 41.

{43}    These cases demonstrate that New Mexico's courts have recognized that they have an inherent power and responsibility to protect minors as their interests may appear to require. The interest at work in this case is in the protection of minors' property interests in tort actions, but the general power and duty of the courts is in my view broader and by itself supports a rule negating the enforceability of waivers such as G-Force's. I do not rely only on my view of the preferable public policy in

28

this area. There are a number of statutory expressions of public solicitude for minor's economic interests.

{44} For example, minors are allowed to repudiate contracts entered into during their minority.[3] *See In re Estate of Duran*, 2003-NMSC-008, ¶¶ 12, 13, 133 N.M. 553, 66 P.3d 326 (holding that an oral partition agreement among siblings could not be enforced against siblings who were minors at the time of the agreement). In addition, general statutes of limitations are extended for minors for a period of one year after they reach majority. NMSA 1978, § 37-1-10 (1975). For children under the "full age of seven years," the Tort Claims Act statute of limitations is extended until their ninth birthday. NMSA 1978, § 41-4-15(A) (1977). New Mexico does not allow parents to avoid, reduce, or forgive child support payments by agreement absent court approval. *Mintz v. Zoernig*, 2008-NMCA-162, ¶¶ 14, 15, 145 N.M. 362, 198 P.3d 861; *Poncho v. Bowdoin*, 2006-NMCA-013, ¶ 32, 138 N.M. 857, 126 P.3d 1221. And, our rules of civil procedure require that minors be represented in litigation by a guardian, conservator, or next friend. Rule 1-017(D). The rule requires the district court to "appoint a guardian ad litem for an infant . . . not otherwise represented . . . or . . . make any other order as it deems proper for the protection of

---

[3]This precept of the law of minors refutes G-Force's blithe argument below that "New Mexico does not give special dispensation to minors participating in recreational activities." Had Child alone signed the waiver form it could not be enforced against her.

29

the infant." *Id.* These provisions are similar to those relied on by the cases cited by Plaintiff holding that a parent cannot waive potential tort claims of their child.

{45} The one provision New Mexico has not adopted—and that most of the cases Plaintiff relies on have—is a statutory requirement of prior court approval of a settlement of a child's cause of action. The statute cited in *Scott*, 834 P.2d at 11 n.17, is typical of such provisions. I agree that the existence of such a statute is an important consideration for courts to include in their analysis. Such statutes are a clear indication of legislative policy providing protection for minors. In the face of such a statement, it would be very difficult for a court to rule that preinjury waivers are allowable if only because they are much more problematic than post-injury releases. *See Shell Oil Co. v. Brinkerhoff-Signal Drilling Co.*, 658 P.2d 1187, 1189 (Utah 1983). Preinjury releases immunize the defendant from responsibility for its future negligence. The expected and natural tendency of preincident immunity is to reduce the incentive of the defendant to guard against negligent practices. The normative impact of tort law is negated to the detriment of the child, their parents, and ultimately the state if it is required to step in and provide care for a seriously injured minor. Thus, for a court to allow preinjury waivers would be illogical and well-nigh unsupportable as a matter of policy.

{46} The question this Court should answer is whether the existence of such a statute is necessary to rule as a matter of the common law. The majority opinion

implies that such a statute is necessary—if not a condition precedent—for this Court to hold that preinjury waivers are not enforceable. It is not. *Hawkins* illustrates the point. *Hawkins* relied on *Scott* for the premise that lack of the ability to unilaterally release an existing tort claim supported a ruling that a parent could not release a child's cause of action prior to an injury. *Hawkins*, 2001 UT 94, ¶ 10. The *Hawkins* court noted that it was not aware of any source of law that granted Utah parents a "general unilateral right to compromise or release a child's existing causes of action without court approval or appointment to that effect." *Id.* ¶ 11. The *Hawkins* court then cited to the Utah Uniform Probate Code for examples of "checks on parental authority to ensure a child's interests are protected." *Id.* The provisions it cited dealt with appointments of conservators for the prosecution of a minor's causes of action. *Id.* New Mexico has substantially the same provisions in its Uniform Probate Code. NMSA 1978, § 45-5-401 (1993); NMSA 1978, § 45-5-404 (2018); NMSA 1978, § 45-5-407 (2019); NMSA 1978, § 45-5-410 (2019); NMSA 1978, § 45-5-424 (1975). Based on the Uniform Probate Code provisions and the right of minors to repudiate contracts, the *Hawkins* court held that parents could not waive a preinjury cause of action. 2001 UT 94, ¶¶ 12, 13.

{47}    To the same effect, though involving different statutory provisions, is *Whitcomb ex rel. Whitcomb v. Dancer*, 443 A.2d 458 (Vt. 1982). In *Whitcomb*, a six-year-old child was bitten by a dog. *Id.* at 459. The child's father brought suit as the

31

child's "next friend." *Id.* The plaintiff offered to settle the suit for $800 and the defendant accepted, by sending a check for $800 along with a stipulation of dismissal. *Id.* at 459-60. Eventually, the plaintiff returned the check and withdrew from the settlement. *Id.* at 460. The trial court enforced the settlement. *Id.* On appeal, the defendant argued that the father could bind his child to the settlement under the terms of a statute that required court approval of settlements that did "not exceed the sum of $500." *Id.* But the statute said nothing about settlements in a larger amount. *Id.* at 461. The court rejected the argument, emphasizing that at common law parents and guardians did not have the authority to compromise a minor's claims without express statutory authorization, noting that minors needed protection for settlements above $500 as much—or more—than for lesser amounts. *Id.*

{48}     I see no reason why this Court cannot exercise its common law authority here on the same bases noted in *Hawkins* and *Whitcomb*. To the contrary, I conclude that this Court has the common law ability—and responsibility—to rule that parental preinjury waivers and releases of their child's tort claims are not enforceable.

**Ambiguity of the Waiver**

{49}     Finally, I conclude that G-Force's waiver form is ambiguous and should not be enforced on that basis. The form is a hodgepodge of provisions that are not well coordinated. The first paragraph does purport to "remise, release and forever discharge" everyone connected with G-Force. But, the discharging party is referred

32

to as the "undersigned." Only the parent signed the waiver form. The fifth paragraph of the form is clearly addressed to the participant of the activity. It is all written in the first person "I." And all of its provisions reflect the activities of the trainee/student. But Child here did not sign the form.

{50}    The sixth paragraph is labelled "**PARENTAL CONSENT.**" The first sentence has the parent asserting that she thinks Child is qualified to participate in the activities at the gym. The release language that follows references only the parent. Nowhere does the form include any language in which the parent releases G-Force "on behalf of" the child athlete. The most natural reading of the language is that the parent is giving up their own right to sue and is shouldering the obligation to indemnify G-Force from any suit that might be filed. On its face, the waiver form did not purport to waive Child's right to sue, and certainly did not impose on Child the obligation to indemnify G-Force. This is not a quibble. If waivers of this type are to be enforced because they are ostensibly easily understood by a lay person, the least the courts should require is for the form to state explicitly that the parent is acting to waive the child's rights. This form does not do so.

{51}    For these reasons, I respectfully dissent from the majority opinion.


_____
**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation.**